10-2404-cv
Altria v. USA

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

—————————————

August Term, 2010

(Argued: June 22, 2011                                    Decided: September 27, 2011)

Docket No. 10-2404-cv

—————————————

ALTRIA GROUP, INCORPORATED,

> *Plaintiff-Appellant*,
>
> v.

UNITED STATES OF AMERICA,

> *Defendant-Appellee*.

—————————————

Before:  NEWMAN, LEVAL, and POOLER, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York, Richard J. Holwell, Judge, denying Plaintiff-Appellant's motion for judgment as a matter of law or for a new trial, after the jury found that Plaintiff-Appellant was not entitled to the requested tax refunds.  Affirmed.

—————————————

> Kenneth S. Geller, Charles A. Rothfeld (*on the brief*), Craig W. Canetti (*on the brief*), Mayer Brown LLP, Washington, DC; David F. Abbott, Mayer Brown LLP, New York, NY; Joel V. Williamson, Andrew W. Steigleder, Mayer Brown LLP, Chicago, IL, *for Appellant*.
>
> David J. Kennedy, Bertrand R. Madsen (*on the brief*), David S. Jones (*on the brief*), Assistant United States Attorneys, *for* Preet Bharara, United States Attorney, Southern District of New York, New York, NY, *for Appellee*.

—————————————

POOLER, *Circuit Judge*:

In this tax refund suit, Altria Group, Inc. claims $24,337,623 in depreciation, interest, and transaction cost deductions for the tax years 1996 and 1997. The claimed deductions result from Altria's participation in nine leveraged lease transactions with tax-indifferent entities. In each transaction, Altria leased a strategic asset from a tax-indifferent entity; immediately leased back the asset for a shorter sublease term; and provided the tax-indifferent entity a multimillion dollar "accommodation fee" for entering the transaction and a fully-funded purchase option to terminate Altria's residual interest at the end of the sublease term. The Government described these transactions as tax shelters—or more precisely, as attempts by Altria to purchase unused tax deductions and transfer money from the public fisc to itself.

After an eleven-day trial before the District Court for the Southern District of New York (Holwell, *J.*), the jury found that Altria was not entitled to the claimed tax deductions. Applying the substance over form doctrine, the jury rejected Altria's contention that it retained a genuine ownership or leasehold interest in the assets and therefore was entitled to the tax deductions. The district court denied Altria's motion for judgment as a matter of law or for a new trial and entered judgment for the Government. Altria appeals, arguing, inter alia, that the district court erred in instructing the jury regarding the substance over form doctrine.

**I.**

Because this appeal "comes to us after a jury verdict, we view the facts of the case in the light most favorable to the prevailing party," here, the Government. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 130 (2d Cir. 2008) (internal quotation mark omitted).

**A.**

This appeal concerns tax deductions that Altria claimed in 1996 and 1997, and which the Internal Revenue Service ("IRS") disallowed. Altria claimed the tax deductions after entering into nine leasing transactions, four of which the parties agreed to focus on at trial. Of these four transactions, three fit the structure of a "sale-in/sale-out" ("SILO") transaction and one fits the structure of a "lease-in/lease-out" ("LILO") transaction. *See generally, e.g.*, Robert W. Wood & Steven E. Hollingworth, *SILOs and LILOs Demystified*, 129 Tax Notes 195 (Oct. 11, 2010) (defining and describing SILOs and LILOs); Maxim Shvedov, Cong. Research Serv., *CRS Report for Congress: Tax Implications of SILOs, QTEs, and Other Leasing Transactions with Tax-Exempt Entities* (2004), *available at* http://digital.library.unt.edu/ark:/67531/metacrs6848 (last visited July 15, 2011) (same). Altria's SILO and LILO transactions share three common features, described briefly below: (1) lease and leaseback; (2) debt financing and rent; and (3) options at sublease termination.

**1.**

In the four representative SILO and LILO transactions, Altria, a taxable entity, entered into a primary or "head" lease with a tax-indifferent entity, such as a government agency or foreign entity, for an interest in a facility. The facilities included a Georgia hydroelectric facility; a New York rail yard; a Netherlands waste treatment plant; and a Florida electrical plant. In the three SILO transactions, the lease terms extended beyond the facility's remaining useful life, allowing Altria to assert that the transactions were sales for tax purposes. In the other transaction—the LILO transaction—the lease term spanned less than 80% of the remaining useful life of the asset, allowing Altria to assert that the transaction was a lease, not a sale.

The tax-indifferent entities could not themselves benefit from tax deductions derived

from utilization of these assets. Altria, however, as a profitable taxable entity, could benefit from tax deductions resulting from use of those assets. Therefore, both Altria and the tax-indifferent entities would benefit from a transaction in which Altria was treated as the owner or lessee of the facility (taking full tax deductions and paying the tax-indifferent entity an "accommodation fee"); the tax-indifferent entity was able to continue free, uninterrupted use of its facility; and both parties' economic risk of loss was minimized.

To allow the tax-indifferent entities to continue using the facilities, Altria immediately leased back each facility to the tax-indifferent entity, using a sublease. Each sublease had a shorter term than Altria's corresponding head lease, but (as discussed below) at the end of the sublease period the tax-indifferent entity could repurchase the facility (terminating Altria's head lease) using no funds of its own but exclusively funds that Altria had placed in escrow for that purpose. During the sublease periods, each tax-indifferent party had full operational control over the facility and was required to pay all insurance, maintenance, improvement, repair, and regulatory costs. As Altria described in a presentation at a worldwide Altria conference:

> ALTHOUGH [ALTRIA] HAS THE TITLE AND IS THE OWNER
> OF THE ASSET,
>
> THE LESSEE BEARS ALL THE COSTS AND RISKS OF
> OWNERSHIP DURING THE LEASE TERM.

**2.**

The financing for each of Altria's SILO and LILO transactions principally entailed: (a) the head lease rent owed by Altria; (b) the sublease rent owed by the tax-indifferent entity; (c) the debt service obligations incurred by Altria to pay the head lease rent; and (d) an accommodation fee paid by Altria to the tax-indifferent entity.

To pay its head lease rent, Altria borrowed about 80% of the needed money through a

-4-

nonrecourse loan. For the rest, Altria contributed its own cash. For each transaction, Altria paid the entire amount due under the head lease (which included the amount needed by the tax-indifferent entity to repurchase the facility at the conclusion of its sublease) in a single upfront payment. *Cf. Reisinger v. Comm'r*, 144 F.2d 475, 477-78 (2d Cir. 1944) (requiring depreciable interest in property at time deduction is claimed). According to each SILO or LILO agreement, those funds were not given to the tax-indifferent entity, but were placed in two accounts ("defeasance accounts") in which a third-party undertaker held the necessary funds and made payments when due under the agreements. *See Wells Fargo & Co. v. United States*, 91 Fed. Cl. 35, 41 (2010) (providing overview of defeasance).

For each transaction, Altria created a debt defeasance account and an equity defeasance account. Each debt defeasance account contained the money Altria borrowed for the transaction. Each equity defeasance account contained part of the cash Altria contributed for the transaction. Altria gave the rest of its cash contribution directly to the tax-indifferent entity as an accommodation fee for purporting to lease or sell its depreciable or amortizable asset. Altria claimed tax deductions totaling $136 million in 1996 and 1997. It paid accommodation fees of over $80 million to its counterparties, giving the hydroelectric facility owner $40.4 million, the rail yard owner $26.3 million, the electrical plant owner $10.6 million, and the waste treatment plant owner $5.5 million.

The undertaker of each debt defeasance account was responsible for using the funds to pay the tax-indifferent entity's rent on its sublease. However, the debt undertaker did not pay the sublease rent directly to Altria, but to Altria's lender to satisfy Altria's debt service obligations on its nonrecourse loan. The sublease rent and the debt service obligations were set to match, in timing and amount, with very few exceptions. Thus, in each transaction the funds were

-5-

transferred in a loop from the lender, to Altria (the nonrecourse loan), to the tax-indifferent entity (to pay the head lease rent), to the debt undertaker (to pay the sublease rent), and then back to the lender (to pay the debt service obligations). Because the debt undertaker and the lender were affiliates, the actual funds never even left the bank for the duration of the transaction. Moreover, the tax-indifferent entities could not control or access the funds in the debt defeasance account.

For each equity defeasance account, the cash contributed by Altria was invested in U.S. Treasury securities, in an apparent attempt to give the transaction a veneer of economic substance. David P. Hariton, *Sorting Out the Tangle of Economic Substance*, 52 Tax L. 235, 325-36 (1999) (noting it is always possible to produce a non-adjusted "profit" simply by including equity in a transaction). Altria prevented the tax-indifferent entities from accessing or exercising any control over the accounts during the sublease term. Even after their subleases ended, the tax-exempt entities had no entitlement to withdraw the funds, as discussed below.

**3.**

At the end of each sublease term, the SILO and LILO agreements provided the tax-indifferent entities with a unilateral option to (re)purchase the facilities at issue, thus terminating Altria's remaining head lease interest. The agreements set the exercise price at a fixed amount, determined at the start of the transaction, equal to or greater than the property's projected fair market value at the end of the sublease term. The purchase option was fully funded by the U.S. Treasury securities in the equity defeasance account, which would increase in value during the sublease term to precisely the purchase option price. If the tax-indifferent entity exercised the purchase option, the funds in the equity defeasance account would flow in a loop, like the funds in the debt defeasance account: from Altria, to the undertaker, back to Altria.

Under the SILO and LILO agreements, if the tax-indifferent entity did not exercise its

-6-

fully-funded purchase option, Altria had three general options: (1) force the tax-indifferent entity to renew the sublease or enter into a service contract; (2) enter into a replacement sublease with a third party; or (3) take possession of the leased property. The options were designed to allow the tax-indifferent entity to retain control of the asset, while reducing Altria's risk of economic loss.

This structure differs from a traditional leveraged lease in a number of ways. Because of the single-purpose nature of the assets at issue (e.g., a rail yard for a metro system), there was no viable secondary market for the facilities. *See Altria Grp., Inc. v. United States*, 694 F. Supp. 2d 259, 266 (S.D.N.Y. 2010) (noting that the jury heard evidence that "in each transaction, Altria and its counterparty effectively entered into a bilateral monopoly in which the asset's price after the transaction's closing would be determined by non-economic factors"). Further, in each transaction Altria invested in assets of "strategic importance" to the tax-indifferent entity's business operations, to ensure that the tax-indifferent party would exercise the purchase option at the end of the sublease term. In addition, the tax-indifferent parties' sublease rent and purchase options were fully defeased, so the transactions created no additional liquidity for Altria beyond the tax benefits. *Id.* at 267. Lastly, the transactions "had the effect of creating tax benefits" that Altria purchased for an accommodation fee, rather than the effect of "transferring a tax benefit between taxpayers that paid comparable tax rates." *Id.* (noting relevance of this fact under Supreme Court case law).

Altria was aware that for tax purposes it needed to maintain a genuine ownership or leasehold interest in the facilities. Thus, Altria obtained financial appraisals for each of the SILO and LILO transactions. At least one appraisal was not completed until years after the transaction, and none were shared with the tax-indifferent entities before the transactions. Each

-7-

appraisal concluded that (1) the tax-indifferent entity would <u>not</u> exercise its fully-funded purchase option at the end of the sublease period; and (2) Altria would choose to enter into a replacement sublease with a third party.

Strikingly, Altria reached the opposite conclusions internally. Altria's internal memoranda concluded that (1) each tax-indifferent entity would "exercise its purchase option [at sublease termination] in order to regain control of the leasehold interest"; and (2) even if it did not, Altria would require the tax-indifferent entity to renew the sublease "at rates that will give [Altria] its economic return" by transferring the funds in the equity defeasance account to Altria. That is, Altria would not exercise its options to find a replacement lessee or take possession if the tax-indifferent entity declined to exercise its purchase option. And for good reason: If Altria could benefit from bringing in a replacement sublessee or taking possession of the leased asset (because of the asset's high resale value), then the tax-indifferent entity, if rational, would exercise its unilateral, fully-funded purchase option to obtain those benefits for itself. If economic conditions were not so beneficial at the end of the sublease, Altria nevertheless could force the tax-indifferent entity to renew the sublease at a predefined price, covered by the funds in the equity defeasance account.

Given these two scenarios, both covered by funds in the equity defeasance account, and both continuing the tax-indifferent party's control of the facility, Altria's memoranda stated that the risks of the transactions were "nominal" and would not expose Altria to any residual value risk. Despite the fundamental inconsistency between Altria's internal memoranda and the appraisals it obtained, no one at Altria questioned this difference. This was not an oversight: "[T]he principal purpose" of the appraisals, one witness testified, "was to support [Altria's] tax position."

Other documents confirmed this purpose. At a worldwide Altria conference, Altria described the SILO and LILO transactions:

> THE NAME OF THE GAME HERE IS TO USE DOLLARS THAT WOULD OTHERWISE HAVE BEEN REMITTED TO THE FEDERAL GOVERNMENT AND INSTEAD INVEST THE PROCEEDS IN ADDITIONAL INCOME PRODUCING ASSETS.

Altria's counterparties agreed. In a board presentation before the Altria transaction, the hydroelectric facility owner stated that the "purpose" of the transaction was to "[t]ransfer tax benefits (accelerated depreciation or accelerated rental expense) to [the] investor." This owner described the transaction as a "Sale for tax purposes" involving "Tax benefits sold to Equity Investors," because "Tax benefits [are] not beneficial to [us]." Similarly, the rail yard owner described the Altria transaction as a "tax benefit transfer" and the electrical plant owner stated that its "objective" was to obtain a "cash benefit"—"through the mon[e]tization of tax benefits."

**B.**

For tax years 1996 and 1997, Altria claimed various tax deductions arising from its SILO and LILO transactions. Altria claimed depreciation deductions with respect to the facilities at issue in the SILO transactions, *see* 26 U.S.C. § 167(a); rental expense deductions for the facility at issue in the LILO transaction, *see id.* §§ 162(a)(3), 178(a); amortization deductions with respect to transaction costs, *see id.* § 162; and interest deductions with respect to the nonrecourse loans, *see id.* § 163.

The IRS denied Altria's claims for tax deductions, assessing income tax deficiencies. On July 11, 2006, Altria filed amended tax returns and paid the assessed deficiencies. As relevant here, Altria requested tax refunds of $4,405,646 for 1996 and $19,931,977 for 1997. On August 23, 2006, the IRS disallowed Altria's claims for tax refunds. Altria had the right to appeal the

decision to the U.S. Tax Court, where a judge would decide the appeal. *See* 26 U.S.C. § 6214.

Instead, Altria filed suit on October 16, 2006 in the U.S. District Court for the Southern District

of New York, pursuant to 26 U.S.C. § 7422, where either party could opt for a jury, *see* 28

U.S.C. §§ 1346(a)(1), 2402. In its answer to Altria's complaint, the Government requested a

jury trial.

In March 2008, both parties moved for summary judgment. After oral argument, the

district court denied both motions. The district court found that there were genuine issues of

material fact regarding "the practical effect of the transactions' defeasance structure," "the level

of financial risk that Altria assumed," and whether there was "any legitimate business purpose

for entering into the transactions."

The case proceeded to a jury trial, over eleven days in June and July 2009. After the

close of evidence, the district court instructed the jury to analyze Altria's four representative

transactions under two common law disallowance methods: the substance over form doctrine

and the economic substance doctrine. Following deliberation, the jury found that both doctrines

barred Altria's tax refund claims. On March 17, 2010, the district court denied Altria's motion

for judgment as a matter of law and for a new trial. *See Altria*, 694 F. Supp. 2d at 285-86. After

the district court entered judgment, Altria timely appealed.

## II.

### A.

The extent to which taxpayers may minimize their taxes by choosing one form for a

transaction rather than another "has preoccupied lawyers and administrators since the inception

of the federal income tax." Marvin A. Chirelstein, *Learned Hand's Contribution to the Law of*

*Tax Avoidance*, 77 Yale L.J. 440, 440 (1968). As Judge Learned Hand observed decades ago,

"[a]ny one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury." *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935).

However, even if a transaction's form matches "the dictionary definitions of each term used in the statutory definition" of the tax provision, "it does not follow that Congress meant to cover such a transaction" and allow it a tax benefit. *Id.* Instead, "'the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended.'" *Knetsch v. United States*, 364 U.S. 361, 365 (1960) (quoting *Gregory*, 293 U.S. at 469); *Gregory*, 69 F.2d at 810 (asking whether "what was done here, was what was intended by [the statute]").

This principle may be summarized by the statement that "[i]n tax law, . . . substance rather than form determines tax consequences." *Raymond v. United States*, 355 F.3d 107, 108 (2d Cir. 2004) (internal quotation marks omitted). "In applying this doctrine of substance over form, the [Supreme] Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978). The Supreme Court "has never regarded 'the simple expedient of drawing up papers,' as controlling for tax purposes when the objective economic realities are to the contrary." *Id.* at 573 (citation omitted). "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." *Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945).

**B.**

Under Section 167(a) of the Internal Revenue Code, Congress allows, "as a depreciation

deduction":

> a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
>> (1) of property used in the trade or business, or
>> (2) of property held for the production of income.

26 U.S.C. § 167(a).

"Only a taxpayer who has a depreciable interest in property may take the deduction . . . ." *Reisinger v. Comm'r*, 144 F.2d 475, 478 (2d Cir. 1944). An entity purporting to own property used in the business or held for the production of income may claim a depreciation deduction, but only if the entity has a genuine ownership interest in the property.[1] *See, e.g.*, *Dab v. Comm'r*, 255 F.2d 788, 790 (2d Cir. 1958) (requiring genuine interest in depreciable asset).

Where two parties purport to transfer an interest in an asset, courts may disregard the purported transfer, for federal tax purposes, "where the transferor continues to retain many of the benefits and burdens of ownership." *Bailey v. Comm'r*, 912 F.2d 44, 47 (2d Cir. 1990) (citing cases); *see also United States v. Regan*, 937 F.2d 823, 826 (2d Cir. 1991) ("[T]he generally accepted rule [is] that for Federal income tax purposes, the owner of property must possess meaningful burdens and benefits of ownership." (internal quotation marks omitted)); *BB&T*

---

[1] Similarly, an entity purporting to hold a lease interest in property used in business or held for the production of income may deduct its rental payments, but only if the entity has a genuine leasehold interest. Regarding whether Altria's investments lacked economic substance and whether their form accurately reflected their substance, the district court instructed the jury that it may consider Altria's claims of (1) genuine ownership of the facilities on which it claimed depreciation deductions; and (2) genuine leasehold interest in the facility for which it claimed deductions for its rental payments. The jury found against Altria as to all of the transactions. In the rest of this opinion, we discuss only the depreciability of the assets over which Altria claimed ownership. We do not separately discuss the deductibility of rental expense for the allegedly leased facility because the question of the genuineness of the purported lease in the LILO transaction turns on the same considerations as the genuineness of the purported sales in the SILO transactions.

*Corp. v. United States*, 523 F.3d 461, 472 (4th Cir. 2008) ("[A] true lease for tax purposes requires a demonstration that 'the lessor retains significant and genuine attributes of the traditional lessor status.'" (quoting *Frank Lyon*, 435 U.S. at 584)).

Thus, Altria was not eligible for depreciation deductions with respect to the litigated transactions unless it obtained, in substance, a genuine ownership interest in the facilities at issue. Whether Altria obtained such an interest is determined by the substance and economic realities of the transaction that gave rise to the asserted interest. *See Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 255 (1939). Because "an income tax deduction is a matter of legislative grace . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer." *Knight v. Comm'r*, 552 U.S. 181, 192 (2008) (internal quotation marks omitted).

For transfer-and-leaseback arrangements, this Court has relied on the Supreme Court's decision in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), as "[t]he touchstone in determining whether the form of an agreement should govern" for tax purposes. *Newman v. Comm'r*, 902 F.2d 159, 163 (2d Cir. 1990). In *Frank Lyon*, the Supreme Court expressly declined to identify particular factors that would determine "the substance and economic realities of the transaction." *Frank Lyon*, 435 U.S. at 582. Rather, the Supreme Court stated that the "significant and genuine attributes of the traditional lessor status . . . in any particular case will necessarily depend upon its facts." *Id.* at 584. In *Frank Lyon*, the Supreme Court acknowledged that "the facts of this case stand in contrast to many others in which the form of the transaction actually created tax advantages that, for one reason or another, could not have been enjoyed had the transaction taken another form." *Id.* at 583 n.18 (favorably citing *Sun Oil Co. v. Comm'r*, 562 F.2d 258 (3d Cir. 1977), which denied tax deductions arising from a purported sale-and-leaseback of land between taxpayer and tax-exempt trust).

-13-

Here, Altria was required to prove that it had the benefits and burdens of owning or leasing the facilities at issue in the four representative transactions. *See Knight*, 552 U.S. at 192. Given *Frank Lyon*'s command that this question "in any particular case will necessarily depend on its facts," 435 U.S. at 584, the district court rightly rejected Altria's attempt to supplant *Frank Lyon*'s inclusive test with five exclusive factors drawn from a nonbinding revenue guideline, used by the IRS "for advance ruling purposes," Rev. Proc. 75-21, 1975-1 C.B. 715. *See also Frank Lyon*, 435 U.S. at 579 n.14 (observing that Revenue Procedure 75-21 was "not intended to be definitive").

Instead, the district court instructed the jury to consider "all the relevant facts and circumstances" and stated that the factors the jury "may consider" "include, but are not limited to": (1) control over the facility; (2) equity investment in the facility; (3) cash flows between the parties; (4) whether the transaction was motivated by "legitimate business purposes, or solely by a desire to create tax benefits"; (5) regulatory realities; (6) whether the facility had an expected useful life beyond the leaseback that Altria could benefit from; (7) whether it was reasonable to expect that the facility would have meaningful value at the end of the leaseback that Altria could benefit from; and (8) whether Altria had the potential to benefit from an increase in the facility's value and suffer a loss of its equity investment in the facility as a result of a decrease in the facility's value. *Altria*, 694 F. Supp. 2d at 270 n.4 (reprinting in full the factors the district court included in its jury instructions). The district court "emphasize[d] . . . that no single factor is determinative" and stated that "[i]n the end, the question is whether Altria retained significant and genuine attributes of traditional owner (or lessor) status."

## C.

Altria challenges four aspects of the district court's jury instructions that differed from

-14-

Altria's proposed instructions. The first three challenges concern the factors a jury may use to determine whether, in substance, a taxpayer established a genuine ownership or leasehold interests in an asset. The fourth challenge concerns the district court's instruction regarding Altria's claim for interest expense deductions with respect to the nonrecourse loans it used to finance the challenged transactions.

We review challenges to a district court's jury instructions de novo. *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010). Viewing the instructions "as a whole," a new trial will not be granted unless a jury instruction "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law" and the error is not harmless. *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006) (internal quotation mark omitted).

**1.**

First, Altria challenges the district court's instruction that the jury "may consider . . . the likelihood that the lessee would exercise its purchase option" in determining whether Altria retained genuine ownership or leasehold interests in the leased assets. *Altria*, 694 F. Supp. 2d at 270 n.4. In particular, the district court instructed the jury that they "may consider . . . the likelihood that the lessee would exercise its purchase option" when determining "[w]hether, at the time the transaction began": (1) "the facility had an expected useful life beyond the leaseback that Altria could benefit from"; (2) "it was reasonable to expect that the facility would have meaningful value at the end of the leaseback that Altria could benefit from"; and (3) "Altria had the potential to benefit from an increase in the facility's value and suffer a loss of its equity investment in the facility as a result of a decrease in the facility's value." *Id.*

Altria contends that the instruction regarding the likelihood that the lessee would exercise its purchase option "allowed the jury to disregard Altria's residual stake in the leased assets

-15-

(certainly the most important factor in determining a lessor's status) if it believed simply that there was a 'likelihood' that the lessee would exercise its purchase option." Altria argues that "a purchase option may negate the residual value factors of ownership in only two circumstances: when a purchase option is *certain* or *virtually certain* to be exercised, as of the closing date of the transaction; or when the purchase price is set at a nominal or bargain level below fair market value."

We disagree. As the district court aptly noted, Altria's argument misunderstands the Government's theory of the case, which was that:

> there were a number of scenarios, including, but not limited to, those where the lessee exercised its purchase option, in which Altria would never take possession of the assets. The cumulative effect of these scenarios, according to the Government, was that Altria only acquired a speculative possibility of assuming the traditional benefits and burdens of ownership.

*Altria*, 694 F. Supp. 2d at 278; *see also* Michael H. Simonson, *Determining Tax Ownership of Leased Property*, 38 Tax Law. 1, 3-18, 31 (1984) (proposing 3-factor test to determine tax ownership of leased property; first factor asks "whether the lessor retained an asset of value at the end of the lease term" and considers, in part, the property's residual value and remaining useful life, whether the property is of limited use, and the existence of fixed-price purchase options, put options, or abandonment clauses in the agreement).

Altria purported to lease an asset from a tax-indifferent party, immediately lease it back for a shorter period of time, and retain a future interest whose scope would be determined at the end of the sublease term. In this context, an instruction that the purchase option must be "certain or virtually certain" would have precluded the jury from considering all of the various post-sublease scenarios, which together shed light on whether Altria retained an asset with

-16-

meaningful value at the end of the sublease term. *See* Simonson, *supra*, at 3-18. For example, even if the tax-indifferent entity did not exercise its unilateral, fully-funded purchase option, Altria could force the entity to renew the sublease and maintain the status quo (as it indicated it would in internal memoranda). Indeed, the Government argued that these two scenarios were the only likely ones. The purchase option was costless; the tax-exempt entity would receive no additional money by declining to exercise it; and if economic conditions made the purchase option unattractive to the tax-indifferent entity, those same conditions would make Altria unwilling to take possession or lease the property to a third party.

Moreover, neither this Court nor the Supreme Court has held that the true substance of the transaction is limited to events that are "certain or virtually certain" to occur. In *Knetsch*, for example, the Supreme Court disregarded a possible, but "wholly unlikely," assumption regarding the taxpayer's future behavior and then concluded that Congress did not intend to provide a tax deduction for such "sham" transactions. 364 U.S. at 366-67 & n.3. And in *Frank Lyon*, the Supreme Court found that the taxpayer incurred a financial risk in the transaction because there was "substantial risk" of loss, "not just the abstract possibility that something will go wrong." 435 U.S. at 577. Further, "[c]haracterization of a tax transaction based on a highly probable outcome may be appropriate, particularly where the structure of the transaction is designed to strongly discourage alternative outcomes." *Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1326 (Fed. Cir. 2011).

The other circuit courts that have reached this issue agree. In the most recent case, the Federal Circuit stated that "[w]e have never held that the likelihood of a particular outcome in a business transaction must be absolutely certain before determining whether the transaction constitutes an abuse of the tax system." *Id.* at 1325-26; *see also* Simonson, *supra*, 38 Tax Law.

at 11, 14 (proposing "reasonable assurance" standard for options at end of sublease). In addition, faced with a LILO transaction similar to Altria's, the Fourth Circuit found that although the tax-indifferent entity could decline to exercise its purchase option at the end of its sublease, it "ha[d] no economic incentive to do [so]." *BB&T*, 523 F.3d at 473. Thus, the Fourth Circuit concluded that the taxpayer's financial appraisal for the transaction, which (like Altria's) reached the opposite conclusion, "plainly does not reflect the economic reality of the transaction." *Id.* at 473 n.13.

Lastly, contrary to Altria's argument, the district court's instruction did not "allow[] the jury to disregard Altria's residual stake in the leased assets . . . if it believed simply that there was a 'likelihood' that the lessee would exercise its purchase option." Rather, the district court listed factors the jury could (and could decline to) consider; "emphasize[d] . . . that no single factor [was] determinative"; and stated that "[i]n the end, the question is whether Altria retained significant and genuine attributes of traditional owner (or lessor) status," *Altria*, 694 F. Supp. 2d at 270-71. Given the wide-ranging and fact-intensive nature of the inquiry under *Frank Lyon*, the district court properly allowed the jury to consider the likelihood that the tax-indifferent entity would exercise its fully-funded purchase option.

**2.**

Second, Altria argues that "the district court failed to provide *any* guidance on *what* levels of equity investment or residual value *are* 'meaningful' in the leasing context." Absent such instruction, Altria argues, "lay jurors could have no basis for determining what is 'meaningful' in this technical, non-intuitive situation," which must "necessarily" have "produced a lawless result."

The two challenged instructions provided that the jury "may consider":

-18-

> Equity Investment: Whether Altria made a meaningful equity investment in the facility, and whether Altria was at risk of losing its equity investment.
>
> [. . .]
>
> Residual Value: Whether, at the time the transaction began, it was reasonable to expect that the facility would have meaningful value at the end of the leaseback that Altria could benefit from. . . .

*Altria*, 694 F. Supp. 2d at 271 n.4.

Altria requested an instruction stating that a 6% equity investment would satisfy the equity investment factor, and an expected residual value greater than or equal to 10 to 20% of the facility's value would satisfy the residual value factor.

Neither the Code, the regulations, nor our case law lays down specific numbers to determine whether an entity retained the benefits and burdens of ownership. Rather, the existence of a depreciable interest in an asset depends on the particular facts of the case. In *Frank Lyon*, the Supreme Court was careful to avoid "condoning manipulation by a taxpayer through arbitrary labels and dealings that have no economic significance." 435 U.S. at 583. Rather than specifying rigid requirements by which to judge lessor status, the Court instead emphasized that the "significant and genuine attributes of the traditional lessor status . . . . in any particular case will necessarily depend upon its facts." *Id.* at 584. The Court recognized that such rigid requirements encourage taxpayers to change merely the form, not the substance, of their transactions, in hopes of gaining favorable tax treatment. *Id.* at 572-73. The precise numerical tests requested by Altria would have the same result. Because *Frank Lyon* specified a fundamentally different approach to determine lessor status for tax purposes, the district court did not err by declining to give Altria's requested instructions.

**3.**

Third, Altria argues that "[t]he district court also instructed the jury that it could consider two factors in the benefits-and-burdens analysis—'Control Over the Facility' and 'Cash Flows'— that are virtually ubiquitous elements of leveraged leases." Altria argues that these factors are "neutral" and "therefore simply are not relevant to determining traditional lessor status."

We reject this argument. First, *Frank Lyon* expressly stated that the tax-indifferent entity's control over the facility during the lease is an important factor in determining ownership. *Frank Lyon*, 435 U.S. at 572-73 ("[T]he Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred."). Although Altria notes this factor is present in all leveraged lease transactions—even true investments—this is irrelevant. It remains a factor the Supreme Court indicated should be considered because, as here, it suggested that Altria's claim of ownership was attenuated. Although this may not be true of every leveraged lease transaction, the other factors expressed by the district court in its jury instructions allow a finding that a leveraged lease is a true investment. Moreover, Altria was free to argue to the jury that this factor did not best indicate "whether Altria acquired and retained the benefits and burdens of ownership"—which was the question the jury was instructed to answer. Indeed, Altria did so, arguing that in "[e]very lease, normally the lessee takes care of the property while he is in possession of it. There is nothing unusual about that."

Second, the absence of cash flows supports the inference that Altria had no equity interest in the property and that the tax-indifferent counterparty lacked control over the money. Other courts have agreed that this is a relevant consideration under *Frank Lyon*. As the Federal Circuit noted regarding a similar transaction, "[t]he only flow of funds between the parties to the

-20-

transaction was the initial lump sum given to the tax-exempt entity as compensation for its participation in the transaction." *Wells Fargo*, 641 F.3d at 1330. "From the tax-exempt entity's point of view," the Federal Circuit noted, "the transaction effectively ended as soon as it began." *Id.*; *see also BB&T*, 523 F.3d at 473 ("[T]he only money that has (and that may ever) change hands between BB&T and Sodra is the $6,228,702 BB&T provided as Sodra's 'incentive for doing the deal.'"); *AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953, 983 (N.D. Ohio 2008) ("[P]erfectly off-setting, circular payments from and then back to the German banks strongly indicate that the AWG transaction has little substantive business purpose other than generating tax benefits for the Plaintiffs . . . ."). Moreover, even if it is "common" for leveraged lease transactions to lack cash flow, the other factors—if a true investment—would allow a finding that the taxpayer had a genuine ownership or leasehold interest.

**4.**

Fourth, Altria argues that the district court erred when it instructed the jury regarding whether Altria could properly claim interest expense deductions with respect to the nonrecourse loans it used to finance the challenged transactions. A taxpayer may properly deduct interest expenses only if the debt is "genuine." *See Bailey v. Comm'r*, 993 F.2d 288, 293 (2d Cir. 1993). Altria argues that we held, in *Bailey v. Commissioner*, 993 F.2d 288 (2d Cir. 1993), that nonrecourse debt is genuine if it does not exceed the value of the collateral security. *See id.* at 292. Accordingly, Altria argues that the district court should have instructed the jury to determine whether the nonrecourse debt in a particular transaction exceeded the value of the collateral security. Instead, Altria argues, the district court erroneously instructed the jury that it could consider other factors in determining whether the nonrecourse debt was genuine, including "the extent to which the parties' obligations are circular."

Altria does not accurately describe our precedent. We did not hold in *Bailey* that nonrecourse debt that does not exceed the value of the collateral security is *always* genuine. Rather, we recognized that such debt is "generally" genuine because if the taxpayer defaults, she will lose an asset worth more than the amount of the debt. *Id.* at 292. Here, however, the pledged nature of the debt defeasance accounts effectively eliminated any possibility that Altria would default on the nonrecourse loans. We find no error in the district court's instruction that the jury could consider other factors in determining whether the nonrecourse debt Altria incurred was genuine, including the circularity of the parties' obligations.

\* \* \*

In sum, Altria has not shown that the district court erred in instructing the jury regarding the substance over form doctrine.

**D.**

Altria also argues that the district court erred by denying Altria's renewed motion for judgment as a matter of law because "the record . . . shows definitively that Altria retained significant and genuine attributes of traditional lessor status."

Under Federal Rule of Civil Procedure 50(a), a district court may "enter judgment as a matter of law against a party on an issue [only if] there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004) (internal quotation marks omitted). "A jury verdict should be set aside only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 79 (2d Cir. 2006) (internal

-22-

quotation marks omitted).

There is not such an absence of evidence here. A reasonable jury could find that Altria did not retain assets of value at the end of the sublease terms; did not retain either the upside potential for economic gain or the downside risk of economic loss; and did not retain significant control over the facilities. *See Frank Lyon*, 435 U.S. at 582-83.

The evidence also reasonably supported the jury's finding that the nonrecourse debt Altria incurred was not genuine. The lender never forbore use of the purportedly loaned funds and Altria never obtained use of those funds. The defeasance arrangements ensured that the funds remained, throughout the period of the loan, under the lender's effective control. *See Deputy v. du Pont*, 308 U.S. 488, 498 (1940) ("'[I]nterest on indebtedness' means compensation for the use or forbearance of money."); *see also Wells Fargo*, 641 F.3d at 1330 (affirming trial court's denial of interest deduction because the debt was not genuine debt but "existed only on a balance sheet"); *BB&T*, 523 F.3d at 476 (as a matter of law, denying interest deduction where there was no genuine debt because the lender "did not forbear any money" and the taxpayer "could not use the money").

We agree with the district court that, as here, "[a] pointlessly complex transaction with a tax-indifferent counterparty that insulates the taxpayer from meaningful economic risk of loss or potential for gain cries out for [substance over form] treatment." *Altria*, 694 F. Supp. 2d at 272. Based on the evidence presented at trial, a reasonable jury could have concluded, like the substantial number of courts that have reached the issue, that Altria lacked genuine ownership or leasehold interests in the facilities that were the subject of Altria's SILO and LILO transactions and that the nonrecourse debt Altria incurred to finance the transactions was not genuine. *See Wells Fargo*, 641 F.3d at 1330-31, *aff'g*, 91 Fed. Cl. 35 (Fed. Cl. 2010); *BB&T*, 523 F.3d at 477,

*aff'g*, No. 1:04CV00941, 2007 WL 37798 (M.D.N.C. Jan. 4, 2007); *AWG*, 592 F. Supp. 2d at 998. *But see Consol. Edison Co. of New York, Inc. v. United States*, 90 Fed. Cl. 228, 340-41 (Fed. Cl. 2009) (finding LILO transaction eligible for rental, interest, and transaction cost deductions).

In sum, we affirm the jury's finding that Altria did not obtain a genuine ownership or leasehold interest in the four facilities or incur genuine debt, and therefore Altria was not entitled to a tax refund for any of its claimed deductions. As a result, we need not review the jury's determinations that none of the four Altria transactions had economic substance. The substance over form doctrine and the economic substance doctrine are independent bases to deny a claimed tax deduction. "The IRS . . . is entitled in rejecting a taxpayer's characterization of an interest to rely on a test less favorable to the taxpayer, *even [if] the interest has economic substance*." *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 231 (2d Cir. 2006) (emphasis added).

\* \* \*

For the foregoing reasons, we **AFFIRM** the judgment of the district court.