16-2953-ag
*Benenson v. Comm'r*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2017

No. 16-2953-ag

JAMES BENENSON, JR. AND SHAREN BENENSON,
*Petitioners-Appellants*,

v.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent-Appellee*.

On Appeal from the United States Tax Court

ARGUED: APRIL 10, 2018
DECIDED: DECEMBER 14, 2018

Before: PARKER, RAGGI, LIVINGSTON, *Circuit Judges*.

Petitioners appeal from a decision of the United States Tax Court (Kerrigan, *J.*), upholding 2008 tax deficiencies identified by

respondent Commissioner upon application of the substance-over-form doctrine to recharacterize various lawful tax-avoiding transactions as tax-generating events for petitioners, their adult sons, a family trust, and a family-controlled corporation. The First and Sixth Circuits have already reversed judgments against petitioners' sons and the corporation. *See Benenson v. Comm'r*, 887 F.3d 511 (1st Cir. 2018); *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779 (6th Cir. 2017). We here review the judgment against petitioners, focusing particularly on the Commissioner's recharacterization of the corporation's tax-deductible "DISC" commission payments as non-deductible constructive dividends to the corporation's shareholders, including petitioner James Benenson, Jr., thereby triggering personal income tax liability for him and his wife.

REVERSED AND REMANDED.

———————

NEAL J. BLOCK (Robert S. Walton, *on the brief*), Baker & McKenzie LLP, Chicago, Illinois, *for Petitioners-Appellants*.

ELLEN PAGE DELSOLE, Attorney, Tax Division (Gilbert S. Rothenberg, Teresa E. McLaughlin, Attorneys, Tax Division, *on the brief*), *for* Richard E. Zuckerman, Deputy Assistant Attorney General, Washington D.C., *for Respondent-Appellee*.

———————

REENA RAGGI, *Circuit Judge*:

At issue on this appeal is a decision of the United States Tax Court (Kathleen Kerrigan, *Judge*), upholding tax deficiencies noticed by respondent Commissioner for tax year 2008 against (1) petitioners, James Benenson, Jr. ("Benenson, Jr.") and his wife Sharen Benenson; (2) petitioners' adult sons, James Benenson III and Clement Benenson ("Benenson sons" or "sons"); and (3) Summa Holdings, Inc. ("Summa"), a C corporation founded and, in 2008, still controlled by Benenson, Jr. *See Summa Holdings, Inc. v. Comm'r*, 109 T.C.M. (CCH) 1612 (2015). The Commissioner identified these deficiencies by applying the substance-over-form doctrine to recharacterize a series of concededly lawful tax-avoiding transactions as tax-generating events.

These transactions included (1) Summa's payments, totaling $2.2 million, in genuine export income as tax-deductible commissions to a qualified domestic international sales corporation ("DISC"); (2) the DISC's payment of $2.2 million in taxable dividends to its sole shareholder, a holding company owned by the Benenson sons' individual retirement accounts ("IRA"); (3) the holding company's after-tax payment of $1.477 million in non-taxable dividends to the Benenson sons' IRAs. There is no question that the "sole reason" for the taxpayers to enter into these aforementioned transactions "was to transfer money into the [sons'] IRAs so that income on assets in the Roth IRAs could accumulate and be distributed on a tax-free basis." App'x 102. They stipulated as much in the Tax Court. The Commissioner concedes that, in form, the money transfers present as lawful, non-taxable returns on IRA investments. Nevertheless, he maintains that, in substance, the transfers effect excess IRA contributions subject to excise taxes. Accordingly, he noticed

3

deficiencies against the sons for such taxes. Further, concluding that the excess contributions derived from the $2.2 million that Summa had treated as deductible DISC commissions, the Commissioner recharacterized those commissions as non-deductible constructive dividends to Summa shareholders, specifically, Benenson, Jr. and a Benenson family trust, thereby triggering income tax deficiencies for Summa, petitioners, and the trust.[1]

Consistent with their diverse residences in Massachusetts (Benenson sons), New York (petitioners), and Ohio (Summa), the taxpayers appealed the Tax Court's judgment to the First, Second, and Sixth Circuits respectively. *See* 26 U.S.C. § 7482(b) (establishing taxpayer residence as appropriate venue for appeals from Tax Court). The First and Sixth Circuits have now reversed the judgment as it pertains to the Benenson sons and Summa, concluding that the substance-over-form doctrine does not support the Commissioner's recharacterization either of Summa's deductible DISC commission payments as non-deductible constructive dividends to its shareholders, *see Summa Holdings, Inc. v. Comm'r* ("*Summa v. Comm'r*"), 848 F.3d 779 (6th Cir. 2017); or of the holding company's dividend payments to the sons' IRAs as excess contributions, *see Benenson v. Comm'r*, 887 F.3d 511 (1st Cir. 2018). On this appeal, we consider petitioners' challenge to the same Tax Court decision as it pertains to them and also reverse.

---

[1] Before the Tax Court, the Commissioner belatedly determined that the tax deficiency attributed to the trust should have been attributed to the trust's beneficiaries, *i.e.*, the Benenson sons, but by that time it was too late to pursue the sons for that obligation. Accordingly, the Tax Court entered no judgment against the trust or the sons for any tax deficiency attributable to constructive dividends from Summa.

4

## BACKGROUND

We assume readers' familiarity with the First and Sixth Circuits' opinions, particularly their detailed discussions of the transactions at issue and the tax code provisions relevant to those transactions. We, therefore, only briefly summarize these matters as pertinent to petitioners' appeal.

## I.    DISCs and IRAs

The transactions at issue sought to take advantage of the tax-minimizing features of two creatures of federal law, DISCs and IRAs.

Congress created DISCs to provide domestic companies with tax incentives to increase exports. *See LeCroy Research Sys. Corp. v. Comm'r*, 751 F.2d 123, 124 (2d Cir. 1984); *see also Benenson v. Comm'r*, 887 F.3d at 514; *Summa v. Comm'r*, 848 F.3d at 782. Toward that end, the tax code allows companies to avoid corporate tax on export income up to 4% of gross export receipts (or 50% of net export income), by paying that amount as tax-deductible "commissions" to a DISC. *See* 26 U.S.C. §§ 993(a)(1), (f); 994(a). The DISC itself pays no tax on the commission income. *See id.* § 991. Rather, tax obligations arise only for DISC shareholders when the DISC distributes dividends to them. *See id.* § 995(a), (b)(1)(E). Thus, tax liability on export income, when channeled through a DISC, can not only be deferred until such distribution, but also can be reduced by application of the dividend tax rate rather than the higher corporate rate that would otherwise apply to export revenues. *See Summa v. Comm'r*, 848 F.3d at 782 (citing relevant statutory provisions in observing that "net effect" of DISC is "to transfer export revenue to the export company's shareholders as a dividend without taxing it first as corporate income"). These benefits obtain even if, as is

5

frequently the case, the exporter and the DISC are related entities and commission transactions between them are not conducted at arms-length. *See* 26 C.F.R. § 1.994–1(a)(1). They obtain even if the DISC is a mere shell entity, as is likely because a DISC "need not have employees or perform any specific function" for its commissions to be immunized from challenge by the Commissioner for tax purposes. *Id.* § 1.993–1(l); *see id.* example 2; *id.* § 1.994–1(a)(2) (providing that DISC tax benefits do "not depend on the extent to which the DISC performs substantial economic functions"). Indeed, as the Commissioner himself acknowledges, as long as a company complies with DISC statutory requirements, its commission payments to a DISC cannot be challenged. *See id.* § 1.992–1(a) (noting that regulations governing DISCs "constitute a relaxation of the general rules of corporate substance otherwise applicable under the Code").

As for IRAs, the law provides for two types: traditional and Roth. Traditional IRAs encourage retirement savings by allowing taxpayers to make tax-deductible contributions to such accounts up to specified limits ($5,000 in 2008). *See* 26 U.S.C. § 219(b)(5) (2008). Contributions to a traditional IRA, as well as earnings on such contributions, are taxed only upon withdrawal. *See id.* § 408(d)(1).

Roth IRAs offer inverse tax incentives. While contributions to such accounts (also limited to $5,000 in 2008) are not deductible from current income, withdrawals from Roth IRAs are not taxed. *See id.* § 408A(c)(2)–(3), (d)(1)–(2). Thus, contributions to Roth IRAs grow tax-free. Income limits restrict participation in Roth IRAs. In 2008, a person filing singly with income over $116,000, or jointly with income over $169,000, could not contribute to a Roth IRA. *See id.* § 408A(c)(3).

6

Excess contributions to either traditional or Roth IRAs are subject to an annual six-percent excise tax until eliminated. *See id.* § 4973(a), (f).

The tax code permits both traditional and Roth IRAs to invest in various legal entities, including, as relevant here, C corporations and DISCs. *See Benenson v. Comm'r*, 887 F.3d at 520 (discussing how various code provisions, read together, lead to that conclusion); *Summa v. Comm'r*, 848 F.3d at 784 (same). But whereas an individual DISC owner is taxed at the dividend rate on DISC dividends, a corporate owner is taxed at the higher corporate rate, and an IRA owner is taxed at the unrelated business income rate, which is equal to the corporate rate. *See* 26 U.S.C. §§ 246(d), 511, 995(g). This makes DISC ownership less attractive for traditional IRAs. *See Summa v. Comm'r*, 848 F.3d at 783 (explaining that DISC dividends are subject to high unrelated business income tax when they go into traditional IRA and, like all withdrawals from traditional IRA, are subject to personal income tax when taken out). Not so for Roth IRAs. While a Roth IRA must also pay unrelated business income tax on any DISC dividends that it receives, ensuing investment gains on those dividends are tax-free because, as with all Roth IRA assets, DISC dividends and gains thereon are not subject to individual income or capital gains taxes when withdrawn. *See id.* (summarizing advantageous interaction between Roth IRAs and DISCs and noting that "one can begin to see why the owner of a Roth IRA might add shares of a DISC to his account").

## II. The Transactions at Issue

Summa is the parent company of several industrial manufacturing subsidiaries with significant export income. During the 2008 tax year, Summa was 99% owned by its founder, Benenson, Jr. (23.18%), and a family trust benefitting the Benenson sons for

7

which petitioners served as trustees (76.05%). Benenson, Jr. then controlled Summa through his majority ownership of the company's voting shares.

From 2002 through 2008, Benenson, Jr., his sons, and Summa engaged in various transactions that they acknowledge had as their sole purpose the transfer of money into the sons' Roth IRAs "so that income on assets in the Roth IRAs could accumulate and be distributed on a tax-free basis." App'x 102. Each Benenson son had established a Roth IRA in 2001, contributing $3,500. Neither made any further contributions to these accounts and, indeed, by 2008, each son's income was too high to allow him to do so. Nevertheless, by 2008, each son's Roth IRA held $3.1 million in assets. How was this achieved?

On January 31, 2002, the sons' Roth IRAs each paid $1,500 to acquire 1,500 shares (a 50% interest each) of a newly formed, Benenson-family controlled DISC, JC Export, Inc. ("JC Export"). That same day, the Benensons also formed a new C corporation, JC Export Holding, Inc. ("JC Holding"), which promptly purchased all JC Export shares from the sons' Roth IRAs in return for an equal number of shares in JC Holding.[2] From January 31, 2002, through December 31, 2008, each of the Roth IRAs continued to own 50% of JC Holding, which remained the sole shareholder of JC Export. By thus owning

---

[2] Questions might be raised about whether the Benenson sons' IRAs paid fair value for their interests in JC Export and JC Holding. *See Benenson v. Comm'r*, 887 F.3d at 524 (Lynch, J., dissenting) (stating that "DISC shares were not purchased at market prices"). But, as both the First and Sixth Circuits have observed, the Commissioner has raised no such challenge. *See id.* at 522 ("[T]he Commissioner has never challenged the valuation of the shares the Roth IRAs purchased in either JC Export or JC Holding."); *Summa v. Comm'r*, 848 F.3d at 783 ("The Commissioner did not challenge the valuation of these shares then and has not challenged them since.").

JC Export indirectly through JC Holding, the sons' Roth IRAs avoided tax-reporting and shareholder obligations for the DISC.

From 2002 to 2008, Summa—presumably with the consent, and possibly at the direction of, its controlling shareholder, Benenson, Jr.—paid millions of dollars of its export income to JC Export as tax-deductible DISC commissions. JC Export promptly distributed those funds as dividends to JC Holding, which paid the required 33% corporate income tax on DISC dividends. JC Holding then distributed the balance as its own dividends to its shareholders, the sons' Roth IRAs. These dividends—totaling over $5 million from 2002 to 2008, with $1.477 million in 2008—entered the sons' IRAs as tax-free returns on their investment in JC Holding. With those returns growing tax-free in the sons' IRAs, by 2008, each IRA had a fair market value of $3.1 million.

## III.    Recharacterization of the Transactions

The Commissioner concedes that the above-described transactions were all lawful in *form*. Nevertheless, in 2012, he determined that, in *substance*, the transactions amounted to excess contributions to the sons' IRAs. Accordingly, for the 2008 tax year, he issued tax deficiency notices not only to the Benenson sons, but also to Summa, Benenson, Jr. and his wife,[3] and the family trust.[4] The Commissioner determined that what Summa had treated as tax-deductible DISC commissions was properly recharacterized as non-deductible dividends from Summa to its shareholders. With the DISC transaction thus recharacterized, the Commissioner concluded that

---

[3] Mrs. Benenson was named in the deficiency notice because she and her husband filed a joint 2008 tax return.

[4] The Commissioner did not notice tax deficiencies for any other years in which the described transfers were made to the sons' IRAs.

Summa owed corporate tax on the DISC commissions that it had deducted from income. Meanwhile, Benenson, Jr., his wife, and the family trust all owed income tax on unreported constructive dividends received from Summa. On such recharacterization, the Commissioner further deemed JC Export not to have received actual DISC commissions and, thus, not to have paid actual DISC dividends to JC Holding, which, therefore, could claim a refund of the corporate taxes it had paid on such dividends. Meanwhile, the Commissioner recharacterized the more than $1.477 million in JC Holding dividends paid to the Benenson sons' IRAs in 2008 as excess contributions on which the sons owed excise tax.[5]

## IV.   Tax Court Proceedings

On January 7, 2013, petitioners initiated this proceeding in the Tax Court to challenge the noticed deficiency in their 2008 income taxes. The action was consolidated with similar challenges by Summa, the Benenson sons, and the family trust. The parties cross-moved for summary judgment on a stipulated factual record.

In an opinion dated June 29, 2015, the Tax Court granted summary judgment to the Commissioner and denied it to the taxpayers. Like the Commissioner, the Tax Court did not identify any of the tax-avoiding transactions at issue as unlawful in form. Nevertheless, it determined that they had been employed to circumvent annual Roth IRA contribution limits and had no non-tax business purpose. In these circumstances, the Tax Court held that the Commissioner had appropriately recharacterized the transactions' form to comport with their substance. On May 20, 2016, the Tax Court

---

[5] Notably, the Commissioner has never maintained that the transactions conceal the economic reality of untaxed gifts from Benenson, Jr. to his sons. Specifically, he has noticed no gift tax deficiency.

10

entered judgment holding that petitioners owed an income tax deficiency of $77,850.

On August 11, 2016, petitioners timely appealed the judgment to this court. Meanwhile, Summa appealed to the Sixth Circuit, which reversed in a unanimous opinion dated February 16, 2017. *See Summa v. Comm'r*, 848 F.3d 779. The Benenson sons appealed to the First Circuit, which also reversed by majority opinion dated April 6, 2018. *See Benenson v. Comm'r*, 887 F.3d 511.

## DISCUSSION

On this appeal, petitioners challenge the Tax Court's decision to uphold a tax deficiency against them based on the Commissioner's recharacterization of Summa's tax-deductible commission payments to a DISC as taxable dividends to Summa shareholders. Petitioners contend that because that recharacterization was expressly rejected by the Sixth Circuit in reversing the related deficiency judgment against Summa, *see Summa v. Comm'r*, 848 F.3d 779, the Commissioner is precluded from relitigating the issue here.[6] In any event, petitioners urge this court to conclude for itself that the substance-over-form doctrine does not support the challenged recharacterization. The Commissioner disputes preclusion and defends the Tax Court's judgment on the merits. For the reasons stated herein, we conclude that the Commissioner is not here precluded from defending the challenged recharacterization. Nevertheless, we hold that the substance-over-form doctrine does not support recharacterization of Summa's DISC commission payments as constructive dividends to its shareholders. Accordingly, we

---

[6] While petitioners do not urge preclusion based on the First Circuit's rejection of the Commissioner's transaction recharacterizations, *see Benenson v. Comm'r*, 887 F.3d 511, they maintain that the decision's reasoning also supports reversal.

11

reverse that portion of the Tax Court judgment holding petitioners liable for $77,850 in 2008 income taxes.

## I.      Standard of Review

The proper characterization of a transaction for tax purposes is a legal question that we review *de novo*.  *See Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978); *Bank of N.Y. Mellon v. Comm'r*, 801 F.3d 104, 112 (2d Cir. 2015).  While we normally review the Tax Court's findings of fact for clear error, *see Bank of N.Y. Mellon v. Comm'r*, 801 F.3d at 112, that principle is not relevant here because the case was submitted to the Tax Court on a stipulated record.

## II.     The Commissioner Is Not Precluded from Defending the Challenged Recharacterization

Petitioners argue that, in defending the deficiency judgment against them, the Commissioner cannot rely on his recharacterization of Summa commissions as shareholder dividends because the Sixth Circuit rejected that recharacterization when the Commissioner relied on it to defend the related deficiency judgment against Summa.  In general, nonmutual offensive collateral estoppel is not allowed against the government.  *See United States v. Mendoza*, 464 U.S. 154, 159–60 (1984); *accord United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 100 (2d Cir. 2014).  Nevertheless, the Supreme Court has permitted government preclusion where, *inter alia*, parties opposing the government in the two lawsuits are the same.  *See United States v. Stauffer Chem. Co.*, 464 U.S. 165, 171–73 (1984). This mutuality requirement can be satisfied by privity, which can be established by showing that the litigant urging preclusion in the subsequent action

"totally controlled and financed" a litigant in the prior action. *United States v. Mendoza*, 464 U.S. at 164 n.9.

Petitioners fail to make such a showing here. It is not enough for them to show that Benenson, Jr. controlled Summa at the time of the transactions at issue, a point that appears undisputed. *See Summa Holdings, Inc. v. Comm'r*, 109 T.C.M. (CCH) 1612, 2015 WL 3943219, at *2 ("From 2001 to 2008 [Benenson, Jr.] had the power to direct Summa's operations, including the transfer of its funds."); Resp't Br. at 4 ("Benenson controlled Summa and its subsidiaries."). What petitioners must establish is that Benenson, Jr. controlled Summa's conduct in the litigation before the Sixth Circuit. *See United States v. Mendoza*, 464 U.S. at 164 n.9. According to petitioners themselves, however, the Benenson sons became Summa's controlling shareholders in 2012, *see* Pet'rs. Br. at 23; Pet'rs. Reply Br. at 7 n.5, well before the filing of the Sixth Circuit appeal. In the face of such an adverse admission, petitioners cannot show the mutuality necessary to support offensive collateral estoppel against the government.[7]

In urging otherwise, petitioners rely on *Taylor v. Sturgell*, 553 U.S. 880 (2008), to argue that mutuality is satisfactorily established by their profession, in advance of the Sixth Circuit decision, to be bound by that court's ruling as to the recharacterization of Summa's commission payments as shareholder dividends. While *Taylor* references such concessions in identifying circumstances where a nonparty to an earlier action might be estopped from relitigating the

---

[7] The First Circuit, in rejecting the Benenson sons' preclusion claim against the Commissioner, declined to consider evidence of a controlling-share transfer to the sons that had not been presented to the Tax Court. *See Benenson v. Comm'r*, 887 F.3d at 516. Here, we deal not with a party's reliance on extra-record evidence to support a preclusion claim; rather, we deal with a party's adverse admission that necessarily defeats that claim.

13

question in a subsequent action, *see id.* at 893–95, it does so in the context of private-party litigation, nowhere suggesting any expansion of the use of nonmutual offensive collateral estoppel against the government. In any event, to the extent *Taylor* recognizes that "a person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement," *id.* at 893 (brackets and internal quotation marks omitted), that example might support collateral estoppel against petitioners based on their agreement to be bound, but it warrants no such conclusion against the Commissioner. As *Taylor* observed, "if separate actions involving the same transaction are brought by different plaintiffs against the same defendant, *all* the parties to *all* the actions may agree that the question of the defendant's liability will be definitely determined, one way or the other, in a 'test case.'" *Id.* (emphasis added) (internal quotation marks omitted). Here, the Commissioner never so agreed.

In sum, we reject petitioners' preclusion claim and proceed to the merits. In doing so, we are respectful of, but not bound by, the First and Sixth Circuit decisions identifying error in the Commissioner's recharacterization of the tax-avoiding transactions common to all three appeals.

## III. The Substance-Over-Form Doctrine Does Not Support the Commissioner's Recharacterization of Summa's DISC Commission Payments as Dividends to its Shareholders

Federal tax obligations are established entirely by statute. *See Benenson v. Comm'r*, 887 F.3d at 517. Thus, as has long been recognized, a taxpayer may "arrange his affairs" to take advantage of those tax code provisions that allow him to minimize his taxes. *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) (L. Hand, *J.*)

14

(observing that taxpayer "is not bound to choose that pattern which will best pay the Treasury"; there is no "patriotic duty to increase one's taxes"), *aff'd*, 293 U.S. 465 (1935). At the same time, however, transactions whose "true nature" triggers statutory tax obligations cannot be "disguised by mere formalisms," "solely to alter tax liabilities." *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *accord Frank Lyon Co. v. United States*, 435 U.S. at 573 (observing that in field of taxation, "administrators of the laws and the courts are concerned with substance and realities"). Thus, "[i]n tax law, . . . substance rather than form determines tax consequences." *Raymond v. United States*, 355 F.3d 107, 108 (2d Cir. 2004) (alteration in original) (internal quotation marks omitted). Put another way, the "objective economic realities of a transaction," rather than "the particular form the parties employed," will determine tax consequences. *Frank Lyon Co. v. United States*, 435 U.S. at 573.

So understood, the substance-over-form doctrine is a tool of statutory interpretation that serves to ensure that the tax code's "'technical language conform[s] more precisely with Congressional intent.'" *Benenson v. Comm'r*, 887 F.3d at 517 (quoting *Dewees v. Comm'r*, 870 F.2d 21, 35 (1st Cir. 1989) (Breyer, *J.*)). The doctrine guards against "labeling-game sham[s]" by "attend[ing] to economic realities" in deciding, for example, whether words used in the tax code, such as "'income,' 'reorganization,' and 'debt,'. . .'contribution' or 'dividend,'" cover particular transactions. *Summa v. Comm'r*, 848 F.3d at 786–87. Such a tool was particularly useful when the tax code was simpler, and when "finite language" had to "account for infinite tax transactions," as well as "an endless supply of tax-reducing ingenuity." *Id.* at 789. The doctrine is appropriately applied more cautiously to the now "highly reticulated Internal Revenue Code, which uses language, lots of language, with nearly mathematic

precision . . . to pursue a wide range of policy goals through a complicated set of tax credits, deductions and savings accounts." *Id.* Specifically, the doctrine is not an invitation for the Commissioner to recharacterize transactions that, in fact, comport with the economic reality of their authorizing code provisions, as higher-tax-yielding transactions "in the service of general concerns about tax avoidance." *Id.* at 787. In short, substance-over-form is a tool to prevent taxpayers from mislabeling transactions "to avoid tax consequences they don't like"; it is not an authorization for the Commissioner to relabel transactions "to avoid textual consequences he doesn't like." *Id.* Thus, "when the taxpayer's formal characterization of a transaction fails to capture economic reality and would distort the meaning of the Code in the process," form properly gives way to substance. *Id.* But if the economic reality of what was done "was the thing which the statute intended," it is of no matter that its purpose was tax avoidance. *Altria Grp., Inc. v. United States*, 658 F.3d 276, 284 (2d Cir. 2011) (internal quotation marks omitted); *see Helvering v. Gregory*, 69 F.2d at 810.[8]

With these principles in mind, we here consider the Commissioner's invocation of the substance-over-form doctrine to recharacterize a series of transactions that he maintains had, as their

[8] The substance-over-form doctrine is related to, but distinct from, the "economic substance" doctrine, sometimes known as the "sham transaction doctrine." *See* 2 Ginsburg, Levin & Rocap, MERGERS, ACQUISITIONS, AND BUYOUTS ¶ 608.1 (Apr. 2018 ed.) (observing that economic-substance doctrine grew out of substance-over-form doctrine); *Altria Grp., Inc. v. United States*, 658 F.3d at 291 (recognizing doctrines as distinct). *But see Summa v. Comm'r*, 848 F.3d at 785 (equating doctrines). The economic-substance doctrine "allows courts to question the validity of a transaction and deny taxpayers benefits to which they are technically entitled under the Code if the transaction at issue lacks economic substance." *Bank of N.Y. Mellon Corp. v. Comm'r*, 801 F.3d at 113 (internal quotation marks omitted). The Commissioner concedes that the transactions here are not lacking in economic substance, and, thus, we do not consider that doctrine further. We consider only whether the form of the transactions at issue reflects the economic reality, *i.e.*, substance, intended by Congress in authorizing legislation.

economic reality, the circumvention of tax code limitations on Roth IRA contributions. Two circuit courts have held application of the doctrine unwarranted here, concluding that the recharacterized transactions have the economic substance identified in the code provisions authorizing their tax-minimizing form.

Thus, as to Summa's payment of a portion of its export income as tax-deductible commissions to a DISC, the Sixth Circuit observed that the payment comported with the economic reality of the DISC program, which is "to enable exporters to defer corporate income tax" by "creat[ing] DISCs as shell corporations that can receive commissions and pay dividends that have no economic substance at all." *Summa v. Comm'r*, 848 F.3d at 786 (observing that economic reality of DISCs is that they "are all form and no substance"); *accord Benenson v. Comm'r*, 887 F.3d at 517–18.

As for JC Holding's payment of $1.477 million in dividends to the Benenson sons' Roth IRAs, the First Circuit majority held that this comported with economic reality because provisions of the tax code expressly allow taxpayer contributions to Roth IRAs to grow tax-free through investment in qualified entities, including DISCs, "even during periods where the taxpayers are no longer allowed to contribute, and even if such growth occurs at a swift rate." *Benenson v. Comm'r*, 887 F.3d at 519–20. Although the Commissioner argued that the IRAs had assumed no investment risk in acquiring JC Holding, the majority concluded that, "at least initially," the degree to which the Roth IRAs would benefit from owning JC Holding depended on the success of Summa's export subsidiaries. *See id.* at 522. As to whether the IRAs had given fair value for their interests in JC Holding, the majority observed that the Commissioner had never urged otherwise. *See supra* at 8 n.2.

Like the Sixth Circuit, and for much the same reasons, we conclude that Summa's payment of deductible DISC commissions was grounded in economic reality and not distortive of the tax code provisions establishing the DISC program. As this court has recognized, Congress created the DISC program specifically to provide a tax incentive for domestic companies in order to "'increase our exports and improve an unfavorable balance of payments.'" *LeCroy Research Sys. Corp. v. Comm'r*, 751 F.2d at 124 (quoting S. Rep. No. 92-437, at 1 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1918). Thus, the tax code permits domestic companies to avoid taxes on a percentage of their export income by paying that amount as tax-deductible "commissions" to DISCs. The DISCs themselves need do nothing to earn such commissions. In fact, they are usually shell corporations created only to receive the commissions and, eventually, to distribute them as dividends to DISC owners. At that point tax obligations do arise for DISC shareholders, who must pay dividend, corporate, or unrelated business taxes on the DISC distribution, depending on their respective status as individuals, C corporations, or IRAs. *See* 26 U.S.C. §§ 1(h), 246(d), 511, 991, 995(b), (f), (g); 26 C.F.R. § 1.884–1(a). It is in this sense that the economic reality of a commission payment to a DISC might be deemed "all form and no substance." *Summa v. Comm'r*, 848 F.3d at 786. Put another way, Congress has itself elevated form over substance insofar as DISC commissions are concerned by affording exporters "commission" deductions for payments that lack the economic substance generally associated with commissions, *i.e.*, some services rendered by the payees. But as long as (1) DISC commissions are a function of genuine export income, and (2) taxes are paid by the recipients of DISC dividends, a domestic company is entitled to a virtually unchallengeable tax deduction for its DISC commissions, with no tax consequences for *its* shareholders.

18

Both circumstances are satisfied here. Indeed, there is no question that (1) the commissions Summa paid to JC Export represented a percentage of genuine export income; and (2) when JC Export distributed those commissions as dividends to its sole shareholder, JC Holding, that shareholder paid corporate tax on the distribution. Thus, the commission payments were real DISC transactions, not sham transfers lacking the economic reality envisioned by Congress when it made such commissions tax-deductible. By thus legislatively characterizing payments of export income to a DISC as deductible commissions, Congress left no room for the Commissioner to recharacterize the payments as something other than commissions for income tax purposes under the substance-over-form doctrine or on the ground that the payments lack a non-tax business purpose.

These circumstances, unique to DISCs, distinguish this case from *Repetto v. Comm'r*, 103 T.C.M. (CCH) 1895 (2012) (recharacterizing IRAs' investment earnings as excess contributions). There, a family set up an ordinary corporation, owned by IRAs, to which the family paid fees for sham services that were never performed. The corporation then transferred the fees thus "earned" to the IRAs as investment earnings. But by contrast to the DISC program, whereby Congress afforded both economic reality and tax benefits to the payment of export income as DISC commissions (even when the DISC did nothing to earn the commissions), nothing in the tax code provides similar congressional approval for treating sham fees as a deductible expense for the payor or genuine income to the corporate payee.

The Commissioner, nevertheless, maintains that the DISC payments here lacked economic reality because the taxpayers did not

avail themselves of the opportunity afforded by the DISC program to defer, as well as reduce, taxes on export income. We hardly think that the DISC form is exalted over its substance when taxes are paid sooner rather than later. Indeed, we think it would be a greater departure from the economic reality Congress intended in the DISC program to deny Summa the deduction Congress afforded when, as here, genuine export income has been paid as DISC commissions and, instead, to impose tax obligations on both Summa and its shareholders for that transfer. In sum, we conclude that the substance-over-form doctrine did not warrant the Commissioner's recharacterizing Summa's lawful, tax-deductible commission payments to a DISC as constructive dividends to Summa's shareholders. In the absence of that recharacterization, there is no basis for the Commissioner's deficiency notice to petitioners or the Tax Court judgment against them. Accordingly, that judgment is reversed.

In reaching that conclusion, we do not overlook the step doctrine, which serves the substance-over-form doctrine by permitting "'steps' in a series of formally separate but related transactions involving the transfer of property" to be treated "as a single transaction" for purposes of identifying economic reality "if all the steps are substantially linked." *Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994).[9] Here, such a link might be identified from the parties' stipulation that the "sole reason" for all the transactions at

---

[9] The step-transaction doctrine appears to have three strains. One looks to whether the steps are so interdependent that the legal relations created by one transaction would have been fruitless without completion of the series. A second looks to whether separate steps constitute prearranged parts of a single transaction intended to reach an end result. A third looks to whether a taxpayer was contractually obligated to complete all steps when the first in the series of transactions was undertaken. *See* Bittker & Lokken, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 4.3.5 (2d/3d ed. 2018 & 2018 Cum. Supp. No. 2). We need not decide which strain might be applicable here.

issue—from Summa's DISC commission payments through JC Holding's dividend payments to the Benenson sons' IRAs—was to transfer money into those IRAs, where it could grow tax-free. App'x 102. But even assuming that viewing all the transactions as one for purposes of *identifying* economic reality were to yield an answer favorable to the Commissioner, that does not necessarily mean that the transactions must be treated as one for purposes of *restoring* economic reality.

To explain: the step-transaction doctrine, like the substance-over-form doctrine is a tool of statutory construction, not of punitive enforcement. Thus, while it is appropriate to view linked transactions as one in order to determine if they belie economic reality or distort the tax code in *some* respect, an affirmative answer does not automatically mandate recharacterization of each transaction in the chain. Rather, the doctrines warrant recharacterization only to the extent necessary to restore reality and eliminate distortion. *See generally Commissioner v. Court Holding Co.*, 324 U.S at 334 (observing that "incidence of taxation depends upon the substance of a transaction" and that "[t]o permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration" of congressional tax policies); *Grove v. Comm'r*, 490 F.2d 241, 246 (2d Cir. 1973) (observing that step-transaction doctrine applies to "meaningless intervening steps in a single, integrated transaction designed to avoid tax liability by the use of mere formalisms"). Once that is achieved, further recharacterizations to maximize each transaction's tax consequences risks crossing the line from restorative to punitive.

21

Here, even assuming, as the Commissioner maintains, that the DISC commission payments, viewed together with all other transactions, served to conceal excess contributions to the Benenson sons' IRAs, *see generally TIFD III-E, Inc. v. United States*, 459 F.3d 220, 231 (2d Cir. 2006) (holding that transaction having economic substance can nevertheless belie economic reality when considered in light of totality of circumstances), *that* economic reality could be restored by recharacterizing a single transaction: JC Holding's payments of non-taxable dividends into the sons' IRAs.[10] With those dividends recharacterized as excess contributions and the sons obligated for excise taxes, no further recharacterization is necessary to restore the Commissioner's professed economic reality or to avoid distortion of the tax code.

Of course, the First Circuit, which considered the sons' appeal in this case, held that no such recharacterization was, in fact, warranted. We need not here decide whether we would reach the same conclusion because the issue is not before us. The Commissioner's recharacterization of the JC Holding dividends as excess IRA contributions did not contribute to petitioners' tax deficiency, the focus of this appeal. That deficiency depends on the recharacterization of Summa's DISC commission payments as dividend distributions to Summa shareholders. We have already explained why that transaction, based on genuine export income that Congress intended to make tax-deductible, does not defy the economic reality of the DISC program. Our point here is that, even when the DISC commissions are viewed as the first in a series of transactions intended to conceal excess IRA contributions, the

---

[10] The recharacterization would recognize that the sons' IRAs had not acquired a true investment interest in JC Holding, which, as noted *supra* in footnote 2, the Commissioner has never urged here.

restoration of economic reality does not require that, in addition to recharacterizing JC Holding dividends as IRA contributions, Summa's DISC commissions must be recharacterized as dividends to its shareholders. *See generally Benenson v. Comm'r*, 887 F.3d at 525 (Lynch, *J.*, dissenting) (observing that "[t]his case is not about whether the IRS must honor the commissions paid from Summa Holdings to JC Export for corporate income tax purposes; it is about whether the IRS must honor the Benensons' characterization of the flow of money from Summa Holdings to the Benensons' Roth IRAs for excise tax purposes").

The Commissioner argues that, even if Summa was entitled to deduct its DISC commission payments from its income, those payments are still properly treated as constructive dividends to Benenson, Jr., because the dividends were paid "for the benefit of [his] family." Comm'r Br. at 56. In support, he cites *Hillsboro Nat'l Bank v. Comm'r*, 460 U.S. 370 (1983), wherein the Supreme Court observed that "a payment by a corporation for the benefit of its shareholders is a constructive dividend," *id.* at 392. The case does not help the Commissioner here. At issue in *Hillsboro* was the proper construction of 26 U.S.C. § 164(e), a tax code provision affording corporations a federal deduction for state taxes paid on behalf of their shareholders. The Court recognized such a tax payment as a constructive dividend to the obligated shareholders, which would generally not be deductible by the corporation. *See id.* The statute, however, expressly afforded the deduction. *See id.* at 393 ("In at least some circumstances, a deductible dividend is within the contemplation of the Code."). Moreover, as to the precise point in dispute, *Hillsboro* held the deduction to apply even though the state, upon a change in law, had there issued refunds to the shareholders. *See id.* at 394 (observing that statutory focus was on "act of payment"; as long as payment was not

"negated by a refund to the corporation," corporation was not required to recognize income).  Thus, in *Hillsboro*, what started as a non-deductible constructive dividend was made a corporate deduction by Congress.  There was no need for the Supreme Court to apply the substance-over-form doctrine to identify Congress's intent.  By contrast here, the transaction at issue—the payment of a percentage of export income as DISC commissions—starts as a congressionally authorized deduction.  The Commissioner seeks to recharacterize it as a constructive dividend, not because the corporation satisfied any shareholder obligation; indeed, there was no shareholder *obligation* here to fund the Benenson sons' IRAs.  Rather, the Commissioner urges recharacterization because the shareholder, at his discretion, had DISC assets directed to his sons' IRAs.  Nothing in *Hillsboro* supports the Commissioner's conclusion.

If Summa was entitled to a deduction for its DISC commissions, as we conclude it was, and if the economic reality of excess contributions to the Benenson sons' IRAs could be restored by recharacterizing JC Holding's dividend payments as excess contributions, then substance-over-form does not require that, at the same time Summa is allowed to deduct its DISC commissions, those commissions be recharacterized as dividends to Summa's shareholders, specifically, petitioner Benenson, Jr.  That conclusion is reinforced, moreover, by the fact that not only did Summa's commission payments to the DISC not defy the economic reality of that program as established by Congress, but neither did the initial transfer of those commission payments out of the DISC.  That transfer was in the form of dividends to DISC shareholder, JC Holding.  The Commissioner has not challenged JC Holding's acquisition of the DISC's shares.  Meanwhile, JC Holding paid the required corporate taxes on the DISC distribution, which were likely more than the

24

dividend taxes Summa shareholders would have paid.[11]  Thus, whatever concerns might arise about the *further* transfer of funds from JC Holding to the sons' IRAs, the transactions up to that point, from Summa to JC Export, and from JC Export to JC Holding, do not lack the economic reality Congress intended in establishing the DISC program.

This is evident if one considers a hypothetical scenario in which JC Holding, upon receipt of the JC Export DISC dividends, made distributions to the sons' IRAs only in amounts equal to their eligible contributions.  That would not have distorted code limits on IRA contributions nor have concealed excess contributions.  That scenario may be unlikely because it would offer the taxpayers here few, if any, benefits.  Nevertheless, the hypothetical demonstrates why we remain of the view that, even if the transactions at issue, viewed as a whole, were correctly determined by the Commissioner to conceal the economic reality of excess IRA contributions, the only recharacterization warranted would recognize JC Holding's dividend distributions to the Benenson sons' IRAs as excess contributions.  To the extent the Commissioner went further and also recharacterized Summa's lawful commission payments to a DISC as non-deductible dividend distributions to Summa shareholders, and on that basis identified a 2008 tax deficiency against petitioners, the Tax Court judgment upholding that deficiency is hereby reversed.

---

[11] Indeed, because no deficiency judgment was entered against Summa's 76.05% shareholder, the family trust, *see supra* at 4 n.1, the taxes the Commissioner seeks to recover from petitioners by recharacterizing Summa DISC commissions as shareholder dividends are only a small percentage of the corporate taxes JC Holding paid on the entirety of such commissions in 2008.

## CONCLUSION

To summarize, on this appeal, we review a Tax Court decision supporting deficiency judgments for 2008 against petitioners, their sons, and Summa Holdings, Inc., a family-controlled corporation. We conclude as follows:

1. Although the First and Sixth Circuits, upon review of the same decision, concluded that the substance-over-form doctrine did not support the deficiency judgments against Summa or the petitioners' sons, petitioners cannot demonstrate the mutuality of parties necessary to preclude the Commissioner from relying on the doctrine to defend the judgment against them.

2. On *de novo* review, the substance-over-form doctrine does not support recharacterization of Summa's payment of tax-deductible commissions to a DISC as taxable constructive dividends to Summa shareholders and, thus, cannot support the tax deficiency attributed to petitioners.

3. Application of the step doctrine, together with the substance-over-form doctrine, warrants no different conclusion. While all related steps in a series of transactions are properly considered as one in identifying the substance, or economic reality, of those transactions, recharacterization of the transactions is warranted only to the extent necessary to restore economic reality and to avoid distortion of the tax code. Here, even if, contrary to our sister circuits, we were to view the DISC commission payments as the first step in a series of transactions that had the economic reality identified by the Commissioner, *i.e.*, the concealment of

26

excess contributions to petitioners' sons' IRAs, a single recharacterization suffices to restore reality, specifically, recharacterizing JC Holding's dividend payments to the sons' IRAs as excess contributions subject to excise tax. That recharacterization does not support the deficiency judgment against petitioners. And the recharacterization that does support the judgment—the treatment of Summa's DISC commissions as constructive dividends to its shareholders— is not warranted by the substance-over-form doctrine.

Accordingly, the judgment in favor of the Commissioner is dismissed, and judgment is entered in favor of petitioners.